UNITED STATES of America

v.

Jonathan S. LEVESQUE; Michael Blais; Stanley J. Fortier; Stephen C. Milton, a/k/a Steve Miller.

Crim. Nos. 85–00020–01–D, 85–0020–02–D, 85–0020–04–D and 85–0020–06–D.

United States District Court, D. New Hampshire.

Dec. 13, 1985.

Kevin E. Sharkey, Richard Johnston, Asst. U.S. Attys., Concord, N.H., for plaintiff.

Charles Flower, Jr., Manchester, N.H., for Levesque.

Jon Meyer, Manchester, N.H., for Blais.

Rodkey* Craighead, Concord, N.H., for Fortier.

John Lebrun, Concord, N.H., for Milton.

## MEMORANDUM OPINION AND ORDER

DEVINE, Chief Judge.

In October 1985 defendants Jonathan Levesque, Michael Blais, Stanley Fortier, and Stephen Milton were charged in a five-count indictment for various drug violations.[1] Count I charged Levesque, Blais, and Fortier with possession with intent to distribute approximately 67,000 dosage units of lysergic acid diethylamide (LSD) on December 20, 1984, in Henniker, New Hampshire, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Count II charged Levesque and Blais with possession with intent to distribute a quantity of LSD on December 27, 1984, in Londonderry, New Hampshire, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Count III charged Fortier with possession with intent to distribute a quantity of LSD on February 21, 1985, in Nashua, New Hampshire, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). Count IV charged Levesque, Blais, Fortier, and Milton with conspiracy to possess with intent to distribute LSD in violation of 21 U.S.C. §§ 841(b)(1)(B) and 846. And Count V charged Blais with possession with intent to distribute approximately 30 dosage units of LSD on December 20, 1984, in Henniker, New Hampshire, in violation of 21 U.S.C. § 841(b)(1)(B).

Defendants, individually and collectively, have made a variety of motions to suppress evidence in this case, and the Court has

---

* —[note: "Rodkey" is a correct spelling].

1. Also charged in the indictment were Carl Connor and Jane Connor. Carl Connor remains, at this writing, a fugitive from these drug charges, while the charges brought against Jane Connor have been disposed of by means of a plea.

held a suppression hearing over the course of seven days to address the issues raised by defendants. For the following reasons, the Court finds defendants' suppression arguments to be without merit and rules that all of defendants' motions to suppress must be denied. As a preliminary matter, the Court assumes without deciding for purposes of this Order that all defendants have standing to raise these suppression issues. For purposes of clarity and organization, the Court's discussion and analysis will focus on three areas: first, those motions related to the stop of defendant Fortier at the Minneapolis-St. Paul International Airport on March 18, 1984; second, those motions related to the arrest of defendants Levesque and Blais on December 20, 1984, the subsequent search of Levesque's trailer on that day, and the search of a Londonderry, New Hampshire, storage locker on December 27, 1984; and third, those motions relating to the arrest of defendant Fortier and the search of his apartment in Nashua, New Hampshire, on February 21, 1985.

*1. Motions Relating to the Stop of Defendant Fortier at the Minneapolis-St. Paul International Airport on March 18, 1984.*

The Court after hearing testimony from Special Agent J.J. Kramer of the Drug Enforcement Administration ("DEA") and defendant Fortier, and after reviewing exhibits entered into evidence, finds the following facts to have occurred at the Minneapolis-St. Paul International Airport on the evening of March 18, 1984.

Fortier, traveling under the name "C. Hill", boarded a Northwest Orient Airlines flight in Boston, Massachusetts, on the afternoon of March 18, 1984, destined for San Francisco, California, with stop-overs in several cities, including Minneapolis-St. Paul, Minnesota. Arriving at the Minneapolis-St. Paul International Airport at approximately 6:30 p.m., almost two hours behind schedule, the airline rescheduled Fortier for a connecting flight to San Francisco via Los Angeles to depart at 9:15 p.m.

While at the Minneapolis-St. Paul Airport awaiting this connecting flight, Fortier, in negotiating a security checkpoint, attempted to conceal a white canvas athletic bag under his jacket. The agents at the checkpoint stopped Fortier and conducted both an X-ray and a physical examination of the bag, finding therein two stacks of United States currency. Fortier explained that the money constituted his life's savings, and he was permitted to continue through the checkpoint with his bag, which he subsequently placed in a coin locker near the departure gate for his connecting flight.

The security agents at the checkpoint notified the airport police department of this incident, and Officer Merle Bossman of that department in turn contacted DEA Agent Kramer, who arrived on the scene at approximately 8:30 p.m. Agent Kramer then located Fortier in a bathroom in the Main Terminal Building and took up surveillance. According to Agent Kramer, Fortier was extremely nervous, employing the bathroom mirror to see if anyone was following him. While walking on the terminal concourse, Fortier on one occasion doubled back in his tracks, and he continually turned his head from side to side. Standing in front of arrival and departure screens at one end of the terminal, Fortier kept shifting his feet in a nervous fashion.

Returning to the departure area, Fortier retrieved his white canvas bag from the locker at approximately 9:05 p.m. and walked up to the check-in counter. At approximately 9:10 p.m. Agent Kramer and Officer Bossman approached Fortier at the ticket counter, displayed their badges, identified themselves as police officers, and asked if they could speak with him for a moment. Fortier responded affirmatively, and at Officer Bossman's suggestion followed the two officers to a portable meal container situated about ten to fifteen feet from the ticket counter. Agent Kramer then asked to see Fortier's airline ticket and some form of identification. Fortier produced his ticket coupon, but no identification. The ticket coupon indicated that it had been purchased by a Mr. "C. Hill" for $610 cash in Boston for a roundtrip flight

to San Francisco, leaving on March 18, 1984, and returning on March 19, 1984. There was no baggage claim check stapled to the coupon, nor did the coupon reveal a home telephone number.

Agent Kramer again asked to see some identification, but Fortier replied that he had none. Agent Kramer then asked Fortier if he was the subject of any outstanding warrants, to which Fortier replied in the negative. Agent Kramer then requested Fortier's name, to which Fortier replied "Charles". Agent Kramer also requested Fortier's date of birth, address, social security number, telephone number, and type of employment. Fortier responded positively to these inquiries, and when asked for the name of someone who could verify his identity, he named his mother, Jeannette Stewart, living at 22 Mason Street, Nashua, New Hampshire, the same address at which he claimed to reside.

Agent Kramer returned the airline ticket to Fortier and inquired if he was carrying any contraband or currency on his person or in his baggage. Fortier replied that he was carrying money, and Agent Kramer inquired as to the amount. Fortier initially responded that it was none of Agent Kramer's business, but then added that he didn't know how much money he was carrying since it did not belong to him. Agent Kramer inquired as to whom the money belonged, to which Fortier replied, "Mike Shaw, Hooksett, New Hampshire". Fortier upon further inquiry failed to produce either a telephone number or an address for Mike Shaw. Agent Kramer inquired further as to why Fortier was carrying the money. Fortier responded that he was just a courier and that he was supposed to deliver it to someone in California, although he did not know exactly to whom. In return for this service, he claimed that he was to receive $200 plus his airfare.

At this point Agent Kramer asked if he and Officer Bossman could examine and count the money in the bag. Fortier responded that he would prefer to avoid such an examination, but that he supposed it was alright. Fortier, however, made no effort to produce the money, prompting Agent Kramer to remark that he would seize the bag, tender a receipt to Fortier, and then permit him to go on his way. Appearing anxious, Fortier expressed concern about missing his flight, but was assured by Agent Kramer that he would not be delayed in catching the flight.[2] At Fortier's request, they moved several feet to another more private counter upon which Fortier placed the bag. He opened the bag and revealed a brown paper bag containing a clear plastic zip lock bag which contained United States currency ($15,000). Fortier then removed another quantity of United States currency ($1,545) wrapped in white paper. This white paper, according to Agent Kramer, revealed notations related to drug trafficking.

As Agent Kramer was in the process of filling out a receipt for the money, Fortier started to place the money back in the bag. Agent Kramer, however, informed Fortier that he was going to seize the money, give him a receipt, and allow him to go on his way. Fortier asked why the money was being seized, and Agent Kramer replied that the money appeared to be drug related. With the money and related papers in Agent Kramer's custody, Fortier produced a New Hampshire driver's license revealing his true identity and signed the receipt employing his true name, "Stanley J. Fortier". Agent Kramer explained that Fortier or the true owner of the money could retrieve the currency by contacting the United States Attorney in Minneapolis, Minnesota. Fortier then left to catch his flight to San Francisco, California.

Defendants Fortier, Levesque, and Blais have moved to suppress the evidence taken from Fortier by law enforcement personnel

---

2. Although the total length of the encounter between Agent Kramer, Officer Bossman, and defendant Fortier lasted about ten minutes, from approximately 9:10 p.m. to 9:20 p.m., and thereby overlapped the originally scheduled departure time of 9:15 p.m., defendant's flight had been delayed and rescheduled for departure at 9:25 p.m., and such information had been duly posted and broadcast at the terminal.

at the Minneapolis-St. Paul International Airport on March 18, 1984, on the ground that the evidence was seized in violation of the Fourth Amendment. Fortier has also moved to suppress all statements made that night on the ground that his detention violated the Fourth Amendment, the statements were involuntary, and he was subject to custodial interrogation and was never apprised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Additionally, defendant Blais has moved to suppress the statements made by Fortier that night on the ground that admission of such statements would violate his right to confrontation. For the following reasons, the Court finds no constitutional infirmities in the actions of the law enforcement officers on the night of March 18, 1984, at the Minneapolis-St. Paul International Airport, and rules accordingly that defendants' motions to suppress must be denied.

Defendants' claim that Fortier was subject to an unreasonable search and seizure in derogation of the Fourth Amendment is found to be without merit. In analyzing this claim, the Court must first determine whether or not defendant Fortier was in fact seized, and if so, whether such seizure was impermissible under the Fourth Amendment.

The United States Supreme Court has held that a person is seized in constitutional terms only when a law enforcement officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen" so that he is not free "to walk away". *Terry v. Ohio*, 392 U.S. 1, 16, 19 n. 16, 88 S.Ct. 1868, 1877, 1879 n. 16, 20 L.Ed.2d 889 (1968). The Court elaborated further in *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), wherein Justice Stewart wrote that a person is seized for purposes of the Fourth Amendment "only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." It is well established, however, that not all police contacts with citizens are deemed seizures within the mean-

ing of the Fourth Amendment. As noted by Justice Stewart in *United States v. Mendenhall, supra,* 446 U.S. at 555, 100 S.Ct. at 1877, which did involve an unreasonable seizure at an airport,

> The respondent was not seized simply by reason of the fact that the agents approached her, asked her if she would show them her ticket and identification, and posed to her a few questions. Nor was it enough to establish a seizure that the person asking the question was a law enforcement official.

The Court in *Florida v. Rodriguez,* —— U.S. ——, 105 S.Ct. 308, 310, 83 L.Ed.2d 165 (1984), reaffirmed that officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking if the person is willing to answer some questions, and by questioning the person if he or she is willing to listen. Such an encounter is plainly consensual in nature and without Fourth Amendment implication. *See, e.g., Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

■ The Court herein finds that the initial approach and questioning of defendant Fortier by Agent Kramer and Officer Bossman on March 18, 1984, was not a seizure within the meaning of the Fourth Amendment. Agent Kramer upon approaching Fortier at the ticket counter simply identified himself as a police officer and asked if he might answer some questions. Fortier agreed to this questioning, and they all moved several feet to one side of the ticket counter. There was no show of force by Agent Kramer and Officer Bossman during this initial encounter, and Fortier's testimony that he was taken physically by the arms is without credibility. Fortier's liberty was not restrained simply because Agent Kramer examined and returned his airplane ticket and requested some form of identification and verification thereof. Although Fortier was not informed that he was not under arrest and that he was free to leave, a reasonable person would have felt free to leave at that point. There was, accordingly, no seizure during the initial

questioning of Fortier. *See, e.g., United States v. Borys,* 766 F.2d 304, 310–11 (7th Cir.1985); *United States v. Manchester,* 711 F.2d 458, 460 (1st Cir.1983); *United States v. Regan,* 687 F.2d 531, 535–36 (1st Cir.1982).

■ The Court finds, however, that a seizure of Fortier did occur after the preliminary questioning had ceased. After Agent Kramer inquired as to whether Fortier was carrying any contraband or currency and indicated that the money in Fortier's bag would be seized as drug related, an atmosphere of restraint existed in which a reasonable person would not have felt free to leave. The First Circuit Court of Appeals in *United States v. Berryman,* 717 F.2d 651, 656 (1st Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1594, 80 L.Ed.2d 125 (1984), has in fact found a seizure to have occurred in an airport stop where there was a prolonged interrogation and the defendant was confronted with the suspicion of drug trafficking.

■ The Court's next query, accordingly, is whether the seizure was unreasonable and thus violative of the Fourth Amendment. As the United States Supreme Court has articulated in *Florida v. Rodriguez, supra,* 105 S.Ct. at 310:

> Certain constraints on personal liberty that constitute 'seizures' for purposes of the Fourth Amendment may nonetheless be justified even though there is no showing of 'probable cause' if 'there is articulable suspicion that a person has committed or is about to commit a crime.' *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (opinion of WHITE, J.). Such a temporary detention for questioning in the case of an airport search is reviewed under the lesser standard enunciated in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and is permissible because of the 'public interest involved in the suppres-

sion of illegal transactions in drugs or of any other serious crime,' *Royer,* 460 U.S. at 498–499, 103 S.Ct., at 1324–1325.

The standard as enunciated in *Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. at 1880, provides that a seizure is justified only where a law enforcement agent can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." In determining whether there is a justified seizure, the Court must view the circumstances attending the seizure in their entirety and give due weight to the experience of the law enforcement personnel involved. *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

■ In the instant case, the Court finds that there were specific and articulable facts which taken together with rational inferences from those facts reasonably warranted the investigative detention herein. First, Agent Kramer knew that Fortier had attempted to conceal his bag under a jacket while passing through a checkpoint. Second, he knew that Fortier was extremely nervous, constantly looking about to see if he was under surveillance.[3] According to Agent Kramer, Fortier was the most nervous individual he had ever observed during his years of work at the Minneapolis-St. Paul International Airport. Third, Fortier's airplane ticket was purchased in cash, for a two-day coast-to-coast excursion, revealed no baggage claim slips nor an address or phone number for the named holder "C. Hill". And fourth, "C. Hill", Fortier, did not produce any identification upon Agent Kramer's request. These facts clearly warrant a reasonable suspicion that Fortier was in possession of ill-gotten money, thereby justifying the minimal intrusion upon his liberty.

■ The Court also finds that the investigative detention was properly limited in

---

3. While a defendant's conformity with a "drug courier" profile is insufficient in and of itself to justify detention, *Reid v. Georgia,* 448 U.S. 438, 440–41, 100 S.Ct. 2752, 2753–54, 65 L.Ed.2d 890 (1980), the facts in the instant case reveal more than just a drug courier profile, particularly where it was established that defendant Fortier attempted to conceal his bag at the security checkpoint.

scope and duration. Fortier was detained for the sole purpose of verifying or dispelling Agent Kramer's and Officer Bossman's suspicion that drug trafficking money was contained in Fortier's shoulder bag. Such verification represents a legitimate and substantial government interest. *Florida v. Royer, supra,* 460 U.S. at 498–99, 103 S.Ct. at 1324–25. Moreover, the length of detention was extremely brief, lasting approximately ten minutes, and Fortier was reassured by Agent Kramer that he would not, in fact, miss his scheduled flight. The degree of intrusion was justified herein, and Fortier's right to be free from unreasonable seizure was not violated.

Fortier raises the related argument that even if he personally was not subject to an unconstitutional seizure, his shoulder bag was the subject of such an unconstitutional search and seizure. The United States Supreme Court in *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), examined the issue of when luggage might be permissibly detained by law enforcement officers, and concluded that when an officer's observations lead to a reasonable belief that the traveler is carrying luggage containing contraband, the principles of *Terry v. Ohio, supra,* 391 U.S. 1, 88 S.Ct. 1868, will permit an officer to detain the luggage that contains the contraband and to briefly investigate the circumstances which gave rise to the suspicion, provided that the investigative detention is properly limited in scope. *See, e.g., United States v. Regan, supra,* 687 F.2d at 538 ("[s]uspects may be stopped and their bags briefly detained on the basis of reasonable suspicion").

■ The Court finds in the instant case that Fortier's shoulder bag was not in fact seized. A seizure of property occurs when there is some meaningful interference with an individual's possessory interest in that property. *See United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 1656 & n. 5, 80 L.Ed.2d 85 (1984). The facts as discussed above reveal the absence of a meaningful interference with the shoulder bag where Fortier consented to opening the bag as well as removing the money. However, even assuming for purposes of argument that the shoulder bag was the subject of an investigative detention, there were sufficient articulable facts to justify the detention. Fortier had attempted to surreptitiously pass the bag through a security checkpoint; he exhibited a high level of anxiety while in the airport; his ticket was for a two-day round trip coast-to-coast flight, paid for in cash, without baggage claim slips; he refused to produce identification; he admitted that he did not own the money in the bag, but was simply functioning as a courier; he could not provide the address for the alleged owner of the money; and he could not identify the person to whom he was delivering the money. These facts more than justified the minimal ten-minute detention of the shoulder bag.

■ The Court finds further that Agent Kramer's remark that should he be unable to examine the bag he would seize it, provide defendant Fortier with a receipt, and allow him to go on his way, did not vitiate Fortier's consent to reveal the currency. *See, e.g., United States v. Borys, supra,* 766 F.2d at 314 (agent's statement that search warrant would be procured absent defendant's consent, by itself, insufficient to invalidate consent). As discussed in *United States v. Borys,* where a defendant consented to a search of a briefcase,

> [t]he agents had adequate cause to detain the luggage, albeit only for a brief period of time, so that their demand that [defendant] either consent to the search of the briefcase or leave it with them was legitimate. [Defendant] cannot argue that his consent was coerced merely because the agents had adequate grounds to insist they be allowed to retain the briefcase for a short period of time.

*Id.* at 314–15. Had Fortier in fact relinquished possession of the bag, Agent Kramer testified that it would have been subjected to examination by a narcotics sniffing dog, and had the dog been alerted

438

by the bag, Agent Kramer would have attempted to procure a search warrant, while had the dog not been alerted by the bag, it would have been returned unopened to Fortier. Accordingly, even assuming that the shoulder bag was seized and subject to an investigatory detention, such detention was justified by reasonably articulable facts, and the removal of the money from the bag was done voluntarily by Fortier. The actions of Agent Kramer and Officer Bossman were not therefore violative of the Fourth Amendment.

Fortier also seeks to suppress the statements that he made at the Minneapolis-St. Paul International Airport, claiming that such statements were, first, the result of a violation of his Fourth Amendment rights; second, were involuntary; and third, were obtained while he was subject to a custodial interrogation, having never been informed of his rights under *Miranda v. Arizona, supra,* 384 U.S. 436, 86 S.Ct. 1602. The Court finds these claims to be without merit for the following reasons.

It is well established that if there has been an illegal search and seizure, any statements derived immediately therefrom are the "fruit" of the illegality and are thus inadmissible. *Wong Sun v. United States,* 371 U.S. 471, 485–87, 83 S.Ct. 407, 416–17, 9 L.Ed.2d 441 (1963). Conversely, where there has been no illegal search and seizure, as in the instant case, there is no "poisonous tree" from which tainted "fruit" may be harvested. Statements given during and after a permissible investigative detention are therefore not subject to suppression under *Wong Sun v. United States, supra,* and the Court rejects this argument for suppression of the statements.

▆ It is also well established that to be admissible, statements by a defendant must be voluntary. This requirement is drawn both from the right against self-incrimination and from standards of due process. *Michigan v. Tucker,* 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). In determining whether a statement is voluntary, the Court will examine the totality of the

circumstances under which the statements were given by a defendant. *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Voluntariness means that the statement was a product of a rational intellect and free will. *Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960).

▆ Examining the totality of the circumstances in this case leads the Court to the conclusion that Fortier's statements to Agent Kramer and Officer Bossman were voluntary. First, the encounter between the law enforcement personnel and defendant was extremely brief, lasting approximately ten minutes. Second, Fortier was not arrested or physically restrained by Agent Kramer and Officer Bossman. And third, there was no show of force or overbearing authority by Agent Kramer and Officer Bossman which would constitute impermissible coercion. The Court is not aware of any caselaw to support the proposition that statements given during the course of a justified investigative detention are to be deemed involuntary. The Court accordingly rejects this argument for suppression.

▆ Fortier lastly argues for suppression on the ground that he was never informed of his *Miranda* rights while subject to a custodial interrogation. It is a well established rule that the Fifth Amendment requires the exclusion of any statements made by an accused person during custodial interrogation unless he has been advised of his right to remain silent and to have an attorney present during questioning and the accused has voluntarily waived those rights. *Miranda v. Arizona, supra; United States v. Porter,* 764 F.2d 1, 6–7 (1st Cir.1985). After reviewing the facts in the instant case, the Court finds that Fortier was not in fact in "custody" for purposes of Fifth Amendment protection on the night of March 18, 1984, and thus finds this argument to be without merit.

The United States Supreme Court most recently had the opportunity to address the issue of custodial interrogation in *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), wherein the Court held that *Miranda* warnings were not required where the defendant, although a suspect, was not placed under arrest and voluntarily came to the police station and was allowed to leave after a brief interview. The Court noted that:

> We held in *Miranda* that '[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' 384 U.S. at 444, 86 S.Ct. at 1612 (footnote omitted).
>
> . . . .
>
> Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest. *[Oregon] v. Mathiason*, 429 U.S. at [492] 495 [97 S.Ct. 711 at 714, 50 L.Ed.2d 714].

*Id.* at 1123–25, 103 S.Ct. at 3519–20.

In the instant case it is undisputed that Fortier was never formally arrested. Moreover, Fortier was never deprived of his freedom of action in any significant way. Although Agent Kramer examined his airline ticket, it was returned to him. Fortier was reassured that he would be able to board his scheduled flight. Agent Kramer and Officer Bossman never exhibited force, either physical or symbolic, in their encounter with Fortier. And on more than one occasion Fortier was informed that he would be permitted to leave. The circumstances in this case fail to reveal a restraint on freedom of the degree associated with a formal arrest. Accordingly, where a person is questioned in a noncustodial setting, *Miranda* protections are unwarranted, and statements made thereat are not subject to suppression.

Lastly, defendant Blais has made a motion *in limine* to exclude the statements that Fortier made to Agent Kramer to the effect that he was just a courier, the money was not his, and that it belonged to "Mike Shaw" of Hooksett, New Hampshire (an alleged alias for Michael Blais). Blais claims that these statements do not fall within the co-conspirator hearsay exception described in Rule 801(d)(2)(E), Fed.R.Evid., because they were not made "in furtherance of the conspiracy", and thus his right to confrontation would be violated if these statements were admitted. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

▇ The Court, however, finds that Fortier's statements were made in furtherance of the conspiracy, the hearsay exception applies, and thus there is no *Bruton* violation. *Dutton v. Evans*, 400 U.S. 74, 80, 91 S.Ct. 210, 215, 27 L.Ed.2d 213 (1970). The fact that Fortier spoke in response to questions from government agents does not negate his purpose to further the conspiracy where he gave this information in a noncustodial setting so that he would be allowed to go on his way, he was in fact allowed to leave, and the alleged conspiracy continued for almost another year. *See United States v. Fahey*, 769 F.2d 829, 838–39 (1st Cir.1985) (exculpatory statements knowingly made to federal agent made in furtherance of conspiracy); *see, e.g., United States v. Warren*, 578 F.2d 1058, 1074–75 (5th Cir.1978); *United States v. Diez*, 515 F.2d 892, 898–99 (5th Cir.1975).

▇ Although *Bruton* does not apply where a statement falls within the co-conspirator exception, possible confrontation clause infirmities might still be present, and the reliability of a co-conspirator's statements must therefore be examined on a case-by-case basis. *United States v. Fahey, supra,* 769 F.2d at 839. To determine if a co-conspirator's statement had the requisite degree of reliability, the Court should examine such factors as whether or not the statements were made in a coercive atmosphere, whether they were crucial to the government's case, and whether they were

**440**

buttressed by other facts on the same matter. *Id.* at 840.

■■■ In this case, defendant Fortier's statements did have the requisite indicia of reliability; hence their admission into evidence would not implicate the confrontation clause. As discussed above, the statements were not given in a coercive atmosphere since Agent Kramer and Officer Bossman exerted neither physical nor psychological force over Fortier while at the airport. Nor was the remark that the money seized belonged to "Mike Shaw" of Hooksett, New Hampshire, so crucial to the government's conspiracy case where defendant Blais was already implicated in the distribution of LSD with defendant Levesque in New Hampshire. The connection between Blais and the conspiracy to distribute LSD is amply buttressed by the following facts: he had been involved with Levesque in a Massachusetts arrest in the summer of 1984 involving large quantities of LSD; he had been arrested on December 20, 1984, in Henniker, New Hampshire, with Levesque, and subsequently large quantities of LSD were discovered in the trailer inhabited by Levesque; and other inculpatory evidence had been seized from that trailer, including a cassette tape recording of several defendants discussing their drug transactions. Accordingly, the Court rejects Blais' challenge to the admission of Fortier's statements made at the Minneapolis-St. Paul International Airport on March 18, 1984. The Court, in light of the above discussion, rules that defendants' motions to suppress both statements made by and evidence seized from defendant Fortier at the Minneapolis-St. Paul International Airport on March 18, 1984, must be and herewith are denied.

*2. Motions Relating to the Arrest of Defendants Levesque and Blais on December 20, 1984; the Subsequent Search of Levesque's Trailer on That Day; and the Search of a Londonderry, New Hampshire Storage Locker on December 27, 1984.*

The Court after hearing testimony from DEA Agents Allan Keaney and Gerald Graffam, New Hampshire State Trooper Richard Gerry, New Hampshire State Police Detective Sergeant Henry Carpenito, defendants Levesque and Blais, and Jane Connor, and after reviewing the exhibits entered into evidence, finds the following facts to have occurred in Henniker, New Hampshire, on December 20, 1984, and in Londonderry, New Hampshire, on December 27, 1984.

Federal and state officers have been participating in an ongoing investigation of LSD distribution in New Hampshire and Massachusetts since at least 1981. Although others were involved, this investigation was focused on defendants Levesque and Blais. Levesque was a fugitive from state charges in Merrimack County relating to a 1981 charge of possession of over 4,000 dosage units of LSD, and he was a fugitive from the Commonwealth of Massachusetts on charges of possessing approximately 14,000 dosage units of LSD in June 1984. Blais was similarly the subject of a capias from Massachusetts for his failure to appear after making bail on the same June 1984 charges, and there was a warrant for him from the Manchester District Court relating to a 1981 case involving the sale of LSD to an undercover state trooper.

At approximately 8:30 a.m. on December 20, 1984, Agent Keaney was driving northbound on Interstate 93 near Manchester, New Hampshire, when he observed a brown and black 1970 Plymouth automobile, Registration No. 25687B, traveling slowly in the righthand lane. Agent Keaney recognized this vehicle as one registered to Carl Connor, a person known to Agent Keaney as an LSD dealer in Manchester. Agent Keaney recognized Carl and Chris Connor in the front seat, but did not at that time identify the third passenger. The Connors are the brothers of Jane Connor, Levesque's common-law wife, and Levesque was reputed to be Carl Connor's source for LSD. Agent Keaney had previously seen this vehicle while on surveillance of LSD distribution activities, and it was also used to take Jane Connor home

from the Concord Hospital after the birth of her and Levesque's second son in September 1984.

Hoping that it would lead him to Levesque and Blais, Agent Keaney followed this vehicle until it turned into the entrance of the Mile-Away Campground ("Mile-Away") in Henniker, New Hampshire. Rather than pursue them by himself, Agent Keaney went to a nearby phone and requested that Agent Graffam and Trooper Gerry join him in Henniker.

The other officers arrived at about 11 a.m., and all three undercover officers then proceeded in an unmarked vehicle to the Mile-Away. Just as they were driving into the campground, a brown International Scout was exiting. In the Scout were the same three people who had previously entered the campground in the Plymouth, and in addition, Agents Keaney and Graffam both recognized the front seat passenger to be Jonathan Levesque.[4] The officers continued a short distance into the campground, turned around, and began following the Scout. After a short time, they caught up so that they could see the license plate, which was NH Registration No. 24311B. Trooper Gerry radioed to the state police headquarters and was told that this vehicle was registered to Brian Farnsworth of 22 Mason Street, Nashua, New Hampshire. This information was significant to the DEA Agents in that 22 Mason Street was the residence of Stanley Fortier, a person known to be involved with Levesque and Blais. Brian Farnsworth's name had also come up in the Nashua Police Department's investigation of Fortier and Levesque.

While on Route 114 in Henniker, the occupants of the vehicle started turning around and looking out the back window. Shortly thereafter, the Scout made a left-hand turn into an inclined private driveway.

Based on their identification of Levesque, the officers felt it would be an opportune moment to stop the vehicle, arrest Levesque, and identify the other occupant. They pulled their vehicle up behind the Scout, exited, identified themselves as police officers, and drew their weapons as they approached the Scout. Carl Connor, who was driving, attempted to speed up the incline, but it was too slippery, and the wheels just spun. Connor turned off the ignition, and the occupants were instructed to exit the vehicle. Still remaining in the back of the Scout was a large Rottweiler dog. As they were exiting the vehicle, one of the occupants, later identified as Michael Blais,[5] broke away and ran up the driveway and behind the house. He was pursued by Trooper Gerry, who tackled him within a short distance. Trooper Gerry handcuffed Blais and patted him down for weapons. Meanwhile, Agents Graffam and Keaney handcuffed the Connors and Levesque, patted them down for weapons, and placed them in a prone position. Agent Keaney then went behind the house and assisted Trooper Gerry in returning with Blais. No weapons were found on any of the defendants, and no further searches of their persons or effects were conducted at the scene.

Upon Blais' return to the Scout, the other defendants were permitted to stand, and all four were read their *Miranda* rights. Each defendant was individually asked if he understood his rights, and all indicated that they did. Levesque made numerous statements to the officers, both before and after he was read his rights. Levesque was apparently angry that Chris and Carl Connor were being detained at all; he stated that they were only helping him search for an apartment, and he kept asking that they be released since it was only he who was wanted. Levesque was also upset that he and the Connors were placed in a prone

---

**4.** While neither Keaney nor Graffam had previously seen Levesque in person, they were very familiar with his rather distinctive appearance from photographs and felt quite confident that they had correctly identified him.

**5.** Agent Keaney testified that he recognized Blais as they stopped the Scout, but Agent Graffam and Trooper Gerry did not, and his identity was apparently not confirmed until his fingerprints were taken at the Henniker Police Station.

position after Blais fled, and he protested, "I'm an LSD dealer, not a murderer." After Levesque stated that the Connors were helping him look for an apartment, Agent Keaney asked where Levesque's family was, and he answered that they were in California with Jane's mother. With the exception of this answer about his family's whereabouts, all of Levesque's statements were volunteered, and were not in response to questioning.

The defendants were transported to the Henniker Police Station for processing. The Scout was not searched at this time because the Rottweiler was still in the back and there were four individuals in custody requiring immediate attention. Trooper Gerry secured the vehicle and arranged to have it towed to a nearby service station since it was blocking a private driveway. All of the defendants were searched more thoroughly at the police station, and some contraband was found. A quantity of marijuana was taken from Levesque, two dosage units of LSD were found on Carl Connor, and 30 dosage units of LSD were discovered loose in the pocket of Blais' sweatshirt by Agent Keaney. Chris Connor had no contraband, and he was not charged with anything.

About one hour after they were initially brought to the station, Chris Connor was released, and he and Trooper Gerry returned to the Scout. No one had entered the Scout since the defendants were removed. After Connor controlled the Rottweiler, Trooper Gerry searched the vehicle. In a five- to ten-minute search, the only item seized was a small black notebook from the floor of the back seat. It was what the officers called a "drug ledger", and it contained references to dosage units in Henniker.

Shortly after transporting Levesque, Blais, Carl Connor, and Chris Connor to the Henniker Police Station for processing, Agents Keaney and Graffam, along with Henniker Police Chief Hassler, returned to the Mile-Away for further investigation. Proceeding to the campground's office, the agents spoke with a woman affiliated with the campground and inquired if she had any knowledge about the two vehicles involved in that day's arrest, specifically the Plymouth automobile, NH Registration No. 25687B, and the brown International Scout, NH Registration No. 24311B. The woman indicated that those vehicles and the individuals apprehended had been associated with the trailer at Lot 77. The agents then drove past Lot 77 and observed the brown and black Plymouth observed earlier that morning by Agent Keaney on Route 93 parked across from Lot 77 with footprints leading between the automobile and the trailer. Returning to the campground office, Agent Keaney asked a young male employee of the Mile-Away if he would find out if anyone was in the trailer at that time. The employee, on the pretext of checking the trailer's water hook-up did so investigate and informed Agent Keaney that an adult female and a small child were in the trailer. Agent Keaney then phoned Lieutenant Brown at the Henniker Police Station, relayed these new facts, and indicated that he was going to secure the trailer in anticipation of a search warrant.

The Court notes that the trailer on Lot 77 was approximately thirty feet in length and ten feet in width. It was a "fifth wheel" trailer subject to movement only when attached to a pickup truck, which in this case was parked several feet from the trailer. The trailer was jacked up at one end by several cement blocks and a piece of lumber. The trailer served as the primary residence of Jane Connor and her common-law husband, defendant Levesque, as well as their two children. The trailer was attached to water, sewage, and electricity at hookups provided by the Mile-Away. In order to prepare the trailer for travel, it would be necessary to disconnect the utility hookups, remove the stabilizing cement blocks, jack up the front end of the trailer, move the truck underneath the trailer, and attach the trailer to the truck. As situated on December 20, 1984, this preparation would take approximately three-quarters of an hour.

Upon learning that a woman and child were in the trailer, Agent Keaney and Chief Hassler approached the trailer and knocked on the door, which was subsequently opened by a young woman. Agent Keaney inquired as to her identity, and the young woman replied she was Jane Connor. Agent Keaney then identified himself and explained that four people associated with the trailer had just been arrested and that he was going to secure the trailer. Jane Connor replied that they could not search the trailer without a search warrant and attempted to close the door. Agent Keaney, however, blocked the door with his foot and told Jane Connor that it was within his authority to secure the trailer until a search warrant could be obtained. Agent Keaney then informed Jane Connor that the agents would remain inside the trailer with her until the warrant was issued or if she decided to leave with her children, the agents would leave also and the trailer would be secured by posting a law enforcement officer outside the trailer. Jane Connor opted for the latter alternative and asked if she could dress her two children prior to departing. Agent Keaney permitted this, but followed her inside the trailer to ensure that she would not destroy any evidence. After dressing the children, she declined an offer of transportation from Agent Keaney and left the premises on foot. The trailer was then secured from the outside. At no time during this period was the trailer searched. Agents Keaney and Graffam and Chief Hassler then returned to the Henniker Police Station.

Detective Sergeant Henry Carpenito was called to the Henniker Police Station at approximately 1:00 p.m. on the afternoon of December 20, 1984. While there, and with the assistance of Agents Keaney and Graffam, Sergeant Carpenito prepared a search warrant application with supporting affidavits for the trailer at Lot 77. Shortly after 5:00 p.m. that evening, Sergeant Carpenito arrived at Judge Douglas Hatfield's office in Hillsboro, New Hampshire, and presented the judge with the application and affidavit for the search warrant. A search warrant was subsequently issued by the judge for the trailer on Lot 77 at the Mile-Away, and at approximately 5:45 p.m. the search was initiated. Seized from the trailer, among other items, was $38,780 in United States currency, an UZI-type submachine gun, various quantities and types of LSD, including 56,000 dosage units of white tablets in 14 clear plastic packets, a set of keys, and a rental agreement for use of a commercial storage locker with Arrow Self Storage in Londonderry, New Hampshire.

On December 27, 1984, Agent Graffam called Arrow Self Storage and spoke with the owner/manager concerning the locker referenced in the agreement seized in the trailer search of December 20. The owner informed Agent Graffam that the storage space referenced in the agreement had been rented to a "Scott Kittle", 210 Hollis Street, Nashua, New Hampshire, who was employed by Wright Way Survey in Manchester, New Hampshire. The owner also informed Agent Graffam that "Scott Kittle", whose description matched that of defendant Levesque, left the name, address, and telephone number of a person in Nashua, New Hampshire, who could be contacted in case of emergency. Agent Graffam attempted to verify all this information, but discovered that the names, places, and telephone numbers utilized in renting the storage locker were either fictitious or inaccurate. In addition, Trooper Gerry visited Arrow Self Storage on December 27, 1984, and confirmed that one of the keys seized from the trailer on Lot 77 at the Mile-Away did in fact fit the lock on the referenced storage locker.

Later on December 27, 1984, Sergeant Carpenito was called to Londonderry to assist Agent Graffam and Trooper Gerry in the preparation of a search warrant application and supporting affidavit for the storage locker. This application was presented to Judge Lawrence Warhall, who issued the search warrant for the storage locker that evening. The search was initiated at approximately 7:30 p.m. Seized from the locker were two license plates from a motor vehicle registered to Carl Connor (a

**444**

vehicle in which Agent Graffam had previously purchased 500 dosage units of LSD in 1983), a license plate and inflatable boat registered to Carl Connor, and approximately 12,000 dosage units of microdot LSD.

Levesque and Blais have filed various motions to suppress items seized and statements made during their arrest and the subsequent search of their persons and the Scout on December 20, 1984. Levesque claims that any statements he made at the time of his arrest should be suppressed because they were made while in custody and either before he was advised of his *Miranda* rights or after his rights were explained to him but without his knowing and intelligent waiver of those rights. Levesque also seeks to suppress the notebook seized from the Scout, claiming that the warrantless search of the vehicle was improper in the absence of exigent circumstances. Defendant Blais similarly seeks to suppress the notebook seized from the Scout on the alternative ground that there was either no probable cause to originally stop the vehicle or that the warrantless search of the Scout was improper since it was not conducted incident to arrest or pursuant to an inventory procedure and there was no probable cause. Finally, Blais seeks to suppress the 30 dosage units of LSD seized from his sweatshirt pocket, claiming that they were not there at the time of his arrest, but were actually planted in his sweatshirt by government agents. For the following reasons, the Court finds these arguments to be without merit and accordingly denies these motions.

■ The stop of the International Scout was proper under the circumstances. In *United States v. Hensley*, —— U.S. ——, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), the Supreme Court held that an investigative stop of a motor vehicle is proper where law enforcement officials have a reasonable, articulable suspicion that an occupant of the vehicle has been involved in or is wanted in connection with a completed felony. In *Hensley*, the officer making the investigatory stop did so on the basis of another police department's "wanted flyer" indicating that the defendant was wanted for investigation of an aggravated robbery, although the officer was unable to determine whether a warrant was outstanding for Hensley's arrest. The facts surrounding the stop in the instant case are even more compelling. Agents Graffam and Keaney both knew there were outstanding warrants for Levesque's arrest from the State of Massachusetts and Merrimack County, New Hampshire, and they had positively identified Levesque as the front-seat passenger. They clearly had a reasonable articulable suspicion that an investigatory stop of the Scout would produce a wanted felon.

■ The agents' actions subsequent to this legitimate, investigatory stop were also proper. Where one of the occupants of a vehicle is a possible fugitive, it is permissible for the officers to approach the occupants with drawn weapons and to use reasonable means (such as handcuffs) to secure the occupants while an investigation is conducted. *United States v. Roper*, 702 F.2d 984, 988 (11th Cir.1983); *United States v. Bautista*, 684 F.2d 1286, 1289–90 (9th Cir.1982); *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983). Accordingly, there was no constitutional infirmity in the stop of the Scout and no grounds to suppress the evidence later discovered in it on this basis.

■ Similarly, there are no grounds to suppress any of the statements made by Levesque at the scene of his arrest. Most of the statements are admissible, even though made while in custody and prior to *Miranda* warnings, because they were unsolicited and not in response to any interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *United States v. Ogden*, 703 F.2d 629 (1st Cir.1983). Interrogation is either direct questioning or "words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response". *Rhode Island v. Innis, supra*, 446 U.S. at 302, 100 S.Ct. at 1690 (emphasis in original). Levesque's

statements that it was he who was wanted, not the Connors, and that he was an LSD dealer, not a murderer, were not in response to either direct questions or actions by the officers reasonably likely to elicit incriminating answers. The only statement Levesque made in response to interrogation concerned the whereabouts of his family. However, Agent Keaney asked this question after Levesque was read his *Miranda* rights, which he indicated he understood. Furthermore, Levesque testified at the suppression hearing that he knew from his prior experiences that he didn't have to answer any questions at the scene of the arrest. Thus, the Court is satisfied that the statement Levesque made in response to Agent Keaney's question is admissible since he knowingly and intelligently waived his *Miranda* rights by answering. No express waiver is necessary. *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

 Defendant Blais' motion to suppress the 30 LSD tablets seized from his sweatshirt pocket is denied because the Court does not find Blais' claim that they were planted by the government agents to be credible.[6] The Court can think of no possible motive the agents would have had to plant this additional evidence. Michael Blais was a fugitive wanted in two states on charges involving the possession and distribution of LSD in far larger quantities. Accordingly, the Court believes the testimony of Agents Keaney and Graffam and Trooper Gerry that the LSD was not planted in Blais' sweatshirt and denies this motion to suppress.

The search of the Scout was proper based on the well-established exception to the warrant requirement that a vehicle is subject to a warrantless search if there is probable cause to believe it will contain contraband or other evidence of a crime. *United States v. Johns*, —— U.S. ——, 105 S.Ct. 881, 83 L.Ed.2d 890 (1985); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26

L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). To find probable cause, "a court can rely on an 'assessment of probabilities in particular factual contexts' that criminal activity may be taking place." *United States v. Moscatiello*, 771 F.2d 589, 596 (1st Cir.1985), *quoting Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 327 (1983).

 In the instant case, the Scout was transporting two men who were fugitives from justice on charges of possessing thousands of dosage units of LSD and other controlled substances. Furthermore, searches at the Henniker Police Station of the four occupants of the Scout revealed that three of them were carrying LSD or marijuana. Clearly, there was probable cause to believe that more contraband or other evidence would be found in the Scout. The fact that the search did not occur until approximately one hour after the Scout had been stopped does not affect the validity of this analysis. Although the rationale for allowing warrantless searches of vehicles is in part based on their inherent mobility, *Chambers v. Maroney, supra*, 399 U.S. at 50–51, 90 S.Ct. at 1980–81, the Supreme Court has repeatedly held that a warrantless search of a vehicle based on probable cause may occur well after it has been immobilized. *United States v. Johns, supra*, 105 S.Ct. at 886–87; *Michigan v. Thomas*, 458 U.S. 259, 102 S.Ct. 3079, 73 L.Ed.2d 750 (1982); *Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975); *Chambers v. Maroney, supra*, 399 U.S. at 52, 90 S.Ct. at 1981. Indeed, the First Circuit Court of Appeals has recently upheld a warrantless search of a vehicle and its contents seven days after the initial stop and seizure. *United States v. McHugh*, 769 F.2d 860 (1985). The one-hour delay in the instant case was quite brief and was justified in that the search could not be conducted until there was a means to control the Rottweiler. Accordingly, the mo-

6. Blais does not raise any Fourth Amendment challenge to this seizure, perhaps because the LSD was seized pursuant to a valid search inci-

dent to his arrest. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973).

tions to suppress the notebook seized from the Scout are denied.

Defendants Levesque, Fortier, and Blais have moved to suppress the evidence seized from the trailer on Lot 77 at the Mile-Away on December 20, 1984, alleging violation of their Fourth Amendment rights. Specifically, they claim that the trailer was unreasonably seized prior to issuance of a search warrant, that no circumstances existed to justify a warrantless search of the trailer, that the affidavit in support of the search warrant was deficient and failed to establish probable cause for the search, and that the search exceeded the scope of the warrant.

■■■ Defendants' claim that the trailer was unreasonably seized prior to the issuance of a search warrant is without merit. It is established law in this Circuit that law enforcement officers may secure premises in anticipation of a search warrant where evidence contained therein is subject to imminent destruction or concealment. *See United States v. Palumbo*, 742 F.2d 656 (1st Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 799, 83 L.Ed.2d 792 (1985). According to the First Circuit in *Palumbo*,

[t]he Court has noted that 'imminent destruction, removal, or concealment of the [evidence] to be seized' may be one type of exigent circumstance which would justify warrantless entry into a dwelling. *United States v. Jeffers*, 1951, 342 U.S. 48, 52, 72 S.Ct. 93, 95, 96 L.Ed. 59; *Johnson v. United States*, 1948, 333 U.S. 10, 15, 68 S.Ct. 367, 369, 92 L.Ed. 436. We have so held. *United States v. DiGregorio*, 1 Cir., 1979, 605 F.2d 1184, 1188, *cert. denied*, 444 U.S. 937, 944, 983, 100 S.Ct. 287, 302, 489, 62 L.Ed.2d 197; *United States v. Edwards*, 1 Cir., 1979, 602 F.2d 458, 468. When such an exigency is found, however, the least restrictive intrusion is to be adopted, or the whole constitutional requirement for obtaining a warrant would be defeated. When it is known that no one is presently on the premises, they may be secured merely by guarding the entrances. *Cf. United States v. Agapito*, 2 Cir., 1980, 620 F.2d

324, 337 *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40; *United States v. Young*, 8 Cir., 1977, 553 F.2d 1132, 1134, *cert. denied*, 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 278. When persons are present and such persons may reasonably be feared to pose a substantial threat to destroy evidence, more intrusive action may be proper. *Cf. United States v. Edwards*, ante, 602 F.2d at 461. Even then, the police might be well advised to give the occupants a choice of exiting the premises. *See United States v. DiGregorio*, ante, 605 F.2d at 1188 n. 3. This might be accompanied by 'a very quick and limited pass through the premises to check for third persons who may destroy evidence.' *United States v. Agapito*, ante, 620 F.2d at 335.

*Id.* at 658–59. The facts in the instant case reveal the type of exigent circumstances warranting a seizure absent a search warrant. First, Agent Keaney had just participated in the arrest of Levesque, a fugitive from justice and reputed drug dealer with a criminal record. Second, Agent Keaney knew that the individuals apprehended on December 20, 1984, had been associated with the trailer at Lot 77. Third, the suspect Plymouth automobile was parked across from Lot 77 with tracks leading between the Plymouth automobile and the trailer. Fourth, one of the four apprehended individuals, Chris Connor, had been released from police custody and could potentially have been on his way back to the trailer. And fifth, Levesque's common-law wife, Jane Connor, was inside the trailer despite Levesque's assertions to the contrary. Given these facts, Agent Keaney's actions in securing the trailer fall well within the parameters of permissible conduct outlined in *Palumbo*. *See also Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 3389, 82 L.Ed.2d 599 (1984) (not an unreasonable seizure of a dwelling or its contents where dwelling secured on basis of probable cause to prevent destruction of evidence pending issuance of search warrant); *United States v. Curry*, 751 F.2d 442, 447–49 (1st Cir.1984).

■ Defendants' claim that the search warrant issued by Judge Hatfield was constitutionally infirm since the supporting affidavit failed to provide the requisite probable cause is similarly without merit. Probable cause exists where "the facts and circumstances within [the agent's] knowledge, and of which they had reasonably trustworthy information ... [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" a crime has been or is being committed, and that seizable property can be found at the place to be searched. *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Carroll v. United States, supra,* 267 U.S. at 162, 45 S.Ct. at 288; *United States v. Drake*, 673 F.2d 15, 17 (1st Cir. 1982). Moreover, when a court reviews the sufficiency of a search warrant, a common sense rather than an overly technical standard must be employed in determining whether probable cause exists. *United States v. Sumpter*, 669 F.2d 1215, 1218 (8th Cir.1982). As articulated by the United States Supreme Court in *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965):

> [A]ffidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a common sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

■ The affidavit prepared by Sergeant Carpenito and presented to Judge Hatfield indicated the following:

1. That on December 20, 1984, Agent Keaney observed an automobile, NH Registration No. 25687B, registered to Carl Connor, containing three male subjects, of which two were identified as Carl and Chris Connor, known to Agent Keaney as dealers of LSD;

2. That Agent Keaney followed that vehicle to the Mile-Away and later observed another vehicle, NH Registration No. 24311B, exiting the Mile-Away with four male passengers;

3. That one of the passengers was identified as Jonathan Levesque, a known and convicted drug dealer who had an outstanding capias issued by the Merrimack County Superior Court and who had been indicted in the same court in November 1981 for possession of a controlled drug with intent to sell;

4. That Sergeant Carpenito had been involved with the arrest and conviction of Donald Lord in December 1982 for possession and intent to sell approximately 5,000 dosage units of LSD and that at the time of Lord's arrest an associate, Stephen Jasolka, stated that Levesque was the source of Lord's LSD;

5. That the four occupants of the vehicle, NH Registration No. 24311B, exiting the Mile-Away were arrested and identified as Jonathan Levesque, Michael Blais, Carl Connor, and Chris Connor;

6. That Sergeant Carpenito had arrested Blais in 1977 for the sale of a controlled substance and that Blais had been indicted in May 1981 for the sale of controlled drugs in the Hillsborough County Superior Court where a capias was later issued;

7. That at the time of the arrests on December 20, 1984, Levesque was in possession of a quantity of marijuana, Blais was in possession of 30 white tablets believed to be LSD, and Carl Connor was in possession of two dosage units of blotter-type LSD;

8. That a black notebook believed to be a drug ledger referencing 30,000 dots was found in the vehicle, registration 24311B;

9. That an employee of the Mile-Away stated the aforementioned vehicles were previously parked at Lot 77;

10. That the treasurer of the Mile-Away stated that the Connor brothers had been

observed at Lot 77 on December 19, 1984; and

11. That Agent Keaney had discovered that Levesque's common-law wife was in the trailer at Lot 77.

The Court is satisfied that the facts as outlined in the affidavit are sufficient to establish probable cause to believe that the individuals apprehended on December 20, 1984, were involved in the illegal distribution of controlled substances, particularly LSD, and that evidence of such distribution would probably be found inside the trailer on Lot 77 at the Mile-Away.

▌ Defendants specifically challenge the probable cause for the search warrant by claiming there were false statements in the affidavit supporting the warrant. Defendants correctly point out that, contrary to the assertion in the affidavit, Levesque was not a "convicted drug dealer". In order to sustain this challenge, defendants must establish by a preponderance of the evidence that this false statement was made knowingly and intentionally or with reckless disregard for the truth. Then, only if the affidavit is insufficient to establish probable cause without the false materials, will the search warrant be voided and the fruits of the search excluded. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); *United States v. Edwards,* 602 F.2d 458, 464–65 (1st Cir.1979).

According to Sergeant Carpenito at the time he prepared the supporting affidavit, he knew Levesque was a drug dealer from personal experience in previous undercover investigations involving the sale of LSD and from information provided by Agents Keaney and Graffam regarding a Massachusetts investigation of Levesque and Blais in the summer of 1984 for drug dealing. Sergeant Carpenito further believed that Levesque had been convicted for dealing drugs on the basis of his recollection of a recent New Hampshire Supreme Court decision, *see State v. Levesque,* 123 N.H. 52, 455 A.2d 1045 (1983), wherein Levesque had been indicted on drug charges and had unsuccessfully raised, upon interlocutory transfer, search and seizure issues. Sergeant Carpenito based his assertion that Levesque was a convicted drug dealer upon telephonic information provided by the New Hampshire criminal records bureau on the afternoon of December 20, 1984. Specifically, the criminal records bureau informed Sergeant Carpenito that: on November 23, 1981, charges against Levesque of selling a controlled substance were *nol prossed* in Hillsborough County; on January 15, 1982, Levesque had been convicted of possession of a controlled drug in Concord, New Hampshire, and sentenced to 30 days in the House of Correction; on November 19, 1981, Levesque had been indicted for possession of drugs with intent to sell; and on November 23, 1981, Levesque had been convicted of bail jumping and sentenced to one month's incarceration. According to Sergeant Carpenito, his statement contained in the affidavit that Levesque was a known and convicted drug dealer was accurate at the time he wrote it.

▌ The Court is satisfied upon review of testimony and evidence presented at the suppression hearing that the description of Levesque as a known and convicted drug dealer was not made knowingly and intentionally or with reckless disregard for the truth. While Sergeant Carpenito may have been somewhat careless in concluding that Levesque had been convicted of dealing drugs, his belief was reasonable in light of his knowledge that Levesque had been indicted for dealing drugs, had been convicted of possessing drugs, and was known as a drug dealer. Erroneous assumptions in an affidavit made by a law enforcement officer from information he has received does not amount to reckless inclusion of false statements in an affidavit. *See, e.g., United States v. Edwards, supra,* 602 F.2d at 465; *United States v. Smith,* 588 F.2d 737, 739–40 (9th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1287, 59 L.Ed.2d 498 (1979). Accordingly, the Court finds and rules that the affidavit in support of the search warrant is not deficient under *Franks v. Delaware, supra,* and contains facts establishing the requisite probable cause to search.

■ Defendants also argue that Judge Hatfield improperly considered extrinsic facts in issuing the search warrant on December 20, 1984. Defendants point to a notation by Judge Hatfield on the back of the warrant in support of this argument. That notation reads: "The officers gave further evidence as to contacts of the parties and drug related activity and the people living at Lot 77." This notation was explained by Sergeant Carpenito, who had presented the search warrant application to Judge Hatfield. According to Sergeant Carpenito, Judge Hatfield asked if the four individuals had been arrested that day; Carpenito confirmed that they had. Judge Hatfield also asked if Jane Connor had returned to the trailer; Carpenito replied in the negative. And Sergeant Carpenito also told Judge Hatfield that Levesque and Blais had been arrested in the summer of 1984 on drug charges and that based on his experience with drug investigations, Levesque and Blais were involved in the distribution of LSD. These remarks comprise the "extrinsic facts" considered by Judge Hatfield of which defendants now complain. The Court is satisfied that these remarks in no way materially supplement or enhance the facts as outlined in the affidavit, which the Court finds sufficient on its face to support the issuance of a search warrant. The Court accordingly rejects this challenge to the search warrant.

The Court would note further that even assuming the search warrant for the trailer at Lot 77 at the Mile-Away was not supported by probable cause, the evidence seized therein would not be subject to suppression in light of the "good faith" exception articulated in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3430, 82 L.Ed.2d 702 (1984). In *Leon*, the United States Supreme Court held that the Fourth Amendment exclusionary rule has no application so as to preclude the admission of evidence seized by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be invalid. According to the Court:

In the absence of an allegation that the Magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause.

*Id.* at 3423. As previously discussed, there was no dishonesty or reckless disregard for the truth by Sergeant Carpenito in preparing the affidavit, and the affidavit was not so facially deficient that the executing officers could not have acted in objectively reasonable reliance thereon. *Cf. Brown v. Illinois*, 422 U.S. 590, 610–11, 95 S.Ct. 2254, 2265–66, 45 L.Ed.2d 416 (1975) (officer's reasonably objective reliance impossible where affidavit so lacking in indicia of probable cause). The Court accordingly rejects this argument for suppression of the evidence seized at the trailer on Lot 77 at the Mile-Away on December 20, 1984.

Defendants finally argue that the actual search of the trailer impermissibly exceeded the scope of the search warrant. It is well established that the Fourth Amendment requires that a search warrant describe with particularity the items to be seized and that general exploratory searches are forbidden. *Stanford v. Texas*, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); *United States v. Abrams*, 615 F.2d 541, 543 (1st Cir.1980). As noted in *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927), with respect to what may be taken pursuant to a search warrant, "nothing is left to the discretion of the officer executing the warrant". It is also established that when an official search is properly authorized by issuance of a valid warrant, the scope of the search is limited by the terms of its authorization. *Walter v. United States*, 447 U.S. 649, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980).

■ The search warrant for the trailer on Lot 77 described the following property to be seized: "controlled drug LSD (Lysergic Acid Diethylamide), marijuana records and ledgers of drug sales and transactions,

U.S. currency, firearms, weights and scales, bank deposit keys and drug paraphernalia." Defendants complain that the officers impermissibly seized certain documents, a cassette tape, film, photographs, and a radio scanner. While it is true that these items were not specified in the warrant, the Court does not find such lack of specificity alone dispositive of this Fourth Amendment issue. Unspecified items in plain view of the areas subject to search may be seized where such items are clearly tied to the crime alleged in the warrant. *United States v. Currier*, 621 F.2d 7, 10 (1st Cir.1980); *United States v. Dauphinee*, 538 F.2d 1, 3 n. 5 (1st Cir.1976); *see, e.g., Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Otherwise stated, "evidence not described in a valid search warrant but having a nexus with the crime under investigation may be seized at the same time the described evidence is seized." *United States v. Kane*, 450 F.2d 77, 85 (5th Cir.1971), *cert. denied*, 405 U.S. 934, 92 S.Ct. 954, 30 L.Ed.2d 810 (1972). Such a seizure is permitted since requiring officers lawfully searching premises to obtain additional warrants for items already discovered but not specifically named in the first warrant is an encumbrance on the law enforcement system. *See United States v. Robinson*, 287 F.Supp. 245 (N.D.Ind.1968).

■ In the instant case, the unspecified items seized during the search had a nexus to the crime under investigation, the illegal distribution of controlled substances, and were seized in plain view of the area subject to search. The officers had reason to believe that the items seized, such as the documents, film, photographs, and cassette tape, would aid in the prosecution of the case. As Sergeant Carpenito testified, cassette tapes are often used by purveyors of illegal drugs to memorialize their drug transactions. The Court accordingly finds that the seizure of unspecified items in this case does not render the search unconstitutional. *See Warden, Maryland State Prison v. Hayden*, 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967) (where agent has probable cause to believe that evidence sought will aid in particular apprehension or conviction, seizure of extrinsic evidence permissible). The Court accordingly denies defendants' motion to suppress the evidence seized at the trailer.

In light of the Court's ruling that the initial securing of the trailer on the afternoon of December 20, 1984, was permitted under the Fourth Amendment and that the subsequent search was conducted pursuant to a valid search warrant, the Court need not decide the issue of whether the mobile home exception to the warrant requirement articulated in *California v. Carney*, —— U.S. ——, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985), is applicable in this case. The Court, however, would note for purposes of judicial economy that this exception would probably not herein apply.

In *Carney*, the Supreme Court held that a warrantless search of a defendant's motor home did not violate the Fourth Amendment. According to the Supreme Court, the motor home at issue in *Carney* was analogous to a motor vehicle; hence, the rationale of the motor vehicle exception to the warrant requirement, *Carroll v. United States, supra*, 267 U.S. 132, 45 S.Ct. at 280, could be applied to the motor home. The Supreme Court focused on the ready mobility of the vehicle and the setting of the vehicle that objectively indicated that the vehicle was being used for transportation. *Id.* 105 S.Ct. at 2070–71. The Supreme Court limited its holding, however, in noting that:

> We need not pass on the application of the vehicle exception to a motor home that is situated in a way or place that objectively indicates that it is being used as a residence. Among the factors that might be relevant in determining whether a warrant would be required in such a circumstance is its location, whether the vehicle is readily mobile or instead, for instance, elevated on blocks, whether the vehicle is licensed, whether it is connected to utilities, and whether it has convenient access to a public road.

*Id.* at 2071 n. 3.

■ The trailer at issue herein was situated in a trailer park and on a lot, objec-

tively indicating that it was being used as a residence. Although the truck which tows the trailer was only a few feet from the trailer, the trailer was not readily mobile in light of the fact that one end of the trailer was elevated on blocks and that the trailer was connected to utilities at the campground, and also because of the three quarters of an hour lead time to connect the trailer and truck. The mobile home exception to the warrant requirement thus would appear to have no application herein.

Defendants have also moved to suppress the evidence seized from the storage locker at Arrow Self Storage in Londonderry, New Hampshire, on December 27, 1984. Defendants assert as grounds for this motion that the search warrant issued by Judge Warhall of the Derry District Court was not supported by probable cause; that if there was any probable cause to search the storage locker, it derived from the previous illegal search of the trailer in Henniker, New Hampshire; and that even if the search warrant was not deficient, the officers exceeded the scope of the warrant in conducting the search. The Court finds these grounds for suppression to be without merit.

■ On December 27, 1984, Sergeant Carpenito presented two affidavits in support of the application for a search warrant for the storage locker. The first affidavit was a copy of the affidavit presented in support of the warrant application for the search of the trailer in Henniker on December 20, 1984. That affidavit has been previously described. The second affidavit presented to Judge Warhall outlined the following facts:

1. That a rental agreement for a storage locker, # B128, at Arrow Self Storage in Londonderry had been seized at the trailer in Henniker;

2. That the rental agreement was in the name of Scott Kittle, 210 Hollis Street, Nashua, New Hampshire, telephone number 603–881–8736;

3. That Agent Graffam tried to verify the identity, location, and telephone number of Scott Kittle without success and concluded that a fictitious identity was used in renting the locker;

4. That the manager of Arrow Self Storage described Scott Kittle as 250 pounds in weight with longish brown hair, 5 feet 11 inches tall, and sloppy looking;

5. That Sergeant Carpenito believed this matched the description of Levesque;

6. That a key found at Levesque's trailer residence fit the lock at locker # B128 at Arrow Self Storage; and

7. That Sergeant Carpenito's belief, based upon over 700 drug investigations, was that drug dealers use fictitious names and use commercial storage facilities to store contraband such as controlled drugs and related paraphernalia.

The Court is satisfied that probable cause existed for issuance of a search warrant herein since the information contained in these two affidavits is sufficient in itself to warrant a man of reasonable caution in the belief that a crime, in this case the distribution of controlled substances, has been or is being committed, and that seizable property could be found in the place to be searched. *Carroll v. United States, supra,* 267 U.S. 132, 45 S.Ct. 280. The Court accordingly rejects defendants' first argument for suppression. Moreover, while it is true that evidence obtained as a result of government impropriety must be excluded, *Wong Sun v. United States, supra,* 371 U.S. 471, 83 S.Ct. 407, it is similarly true that where there is no impropriety, evidence need not be suppressed. Thus, where evidence obtained in a constitutionally firm search and seizure creates probable cause for a search at another location, evidence obtained at the second location is not subject to suppression under the reasoning of *Wong Sun.* Accordingly, where the Arrow Self Storage locker agreement and key were seized pursuant to a valid search warrant at the trailer in Henniker, the probable cause to search the locker established by knowledge of the existence of these items was not unconstitutionally tainted. There can be no "tainted fruit" in the absence of a "poisonous tree", and the Court thus

rejects defendants' second argument for suppression.

Defendants lastly argue that items not described in the search warrant were impermissibly seized from the locker. As noted previously, the scope of a search is limited by the terms of the authorization, *Walter v. United States, supra,* 447 U.S. 649, 100 S.Ct. 2395, but items not described but connected with the crime under investigation may be seized during the initial search when in plain view. *Coolidge v. New Hampshire, supra,* 403 U.S. 443, 91 S.Ct. 2022; *United States v. Dauphinee, supra,* 538 F.2d at 3 n. 5. In this case, the seizure of certain undescribed items such as the New Hampshire vehicle registration plates (# 980868) registered to Carl Connor, a boat registration plate (# LS24) registered to Carl Connor, and the padlock of the storage locker door was permissible. These items have the requisite nexus to the crime under investigation, the illegal distribution of controlled substances. According to Agent Graffam, the vehicle registration plates (# 980868) belonged to a vehicle in which he had made an undercover purchase of LSD in 1983. The Court thus concludes that the officers executing the search warrant at Arrow Self Storage in Londonderry on December 27, 1984, did not impermissibly exceed the scope of the warrant in violation of the Fourth Amendment. Accordingly, the Court rejects this challenge to the evidence seized at the Arrow Self Service locker.

In summary, the Court rules that defendants' motions to suppress evidence seized and statements made pursuant to the stop of the Scout and arrest of its occupants in Henniker must be and herewith are denied. Defendants' motions to suppress evidence seized at both the trailer in Henniker and the storage locker in Londonderry, New Hampshire, in December 1984 likewise are denied.

*3. Motions Relating to the Arrest of Defendant Fortier and the Search of his Apartment on February 21, 1985.*

The Court after hearing testimony from DEA Agent Gerald Graffam, Detective Sergeant James Brackett, Detective Craig Ritz, and Detective Roland Bouchard, Jr., of the Nashua Police Department, Joyce Winslow, Donald Winslow, Debra Foote, and defendant Fortier, and after reviewing the exhibits entered into evidence, finds the following facts to have occurred in Nashua, New Hampshire, on February 21, 1985.

At approximately 9:20 p.m. on February 21, 1985, Detective Bouchard of the Nashua Police Department obtained a search warrant from Judge Nicholas Pantelas permitting the immediate search of the first floor apartment at 22 Mason Street, Nashua, New Hampshire, and the person of Stanley J. Fortier to seize controlled drugs and serialized United States currency. Earlier that evening the Nashua police and a DEA agent had participated in the undercover purchase of 300 dosage units of LSD under circumstances which led them to believe that more controlled drugs and the serialized money used to make the purchase would be found on the person of Fortier or in his home. At approximately 9:42 p.m., a dozen uniformed and plainclothes officers arrived at 22 Mason Street to execute the search warrant. As they arrived, a vehicle was backing out of the driveway, and the officers forcibly stopped the car and detained its occupant during the pendency of the search.

The officers initially went to the first floor apartment of 22 Mason Street, where they were told by Fortier's mother that her son actually lived in a converted garage a short distance from the main structure. While several officers hurried to this other structure, Sergeant Brackett went to the back of the garage and climbed on top of a fence, from where he could observe Fortier in the bathroom. Sergeant Brackett yelled to the officers in front that Fortier was in the bathroom. Detective Ritz and Captain Gerry Watson were the first officers to reach the garage door. Captain Watson knocked, and the door was simultaneously opened by a female, later identified as Debra Foote, Fortier's common-law wife. Detective Ritz immediately noticed a closed door directly across from him with lights

on around the inside of the door, and he could hear the noise of a toilet repeatedly flushing from this room. Detective Ritz rushed to this door and unsuccessfully tried to open it. He advised Fortier who he was, and the door was opened shortly thereafter. Fortier's pants were wet, and his hand was bleeding from a cut. There was blood on the toilet seat area, water on the floor around the toilet, and several small shards of glass at the bottom of the toilet bowl.

Fortier was brought out into the living room, shown the search warrant, and given his *Miranda* rights. Detective Bouchard conducted the search of Fortier's person. He found and seized $841 ($460 of which matched the serialized money previously used in the undercover LSD purchase) from Fortier's front pockets, and a small black notebook from his back pocket. This notebook was seized because Detective Brackett noted upon its examination that there were names of people listed therein whom he knew to be involved in illicit drug activity. Fortier was advised by Sergeant Brackett that he was under arrest for the sale of a controlled drug. Several of the officers began to search the premises, but Sergeant Brackett instructed them to stop because they did not have a warrant for the garage. Nothing was seized from these premises. Before Fortier was taken to the Nashua Police Station, he asked if he could take a jacket with him. One of the officers handed him a black leather jacket. Two pieces of paper containing names, locations, and amounts of money were seized from the pocket of this jacket.

Defendant Fortier seeks to suppress the evidence seized from his person and apartment on February 21, 1985, on several grounds. He claims that the search warrant Detective Bouchard obtained was only for the first floor apartment at 22 Mason Street, and not for the renovated garage where Fortier actually lived. Thus, the officers improperly entered and searched this separate building, and all evidence obtained therein (and from the person of Fortier) was illegally seized. Fortier further submits that if the Court views this search as being "federal" in character (DEA Agent Graffam having participated to some degree in the application for and execution of the search warrant), then the notice requirements of 18 U.S.C. § 3109 were not complied with, nor does the warrant comply with the time period specifications of Rule 41(c)(1), Fed.R.Crim.P. As a result, Fortier claims the search of his apartment and person were unlawful and all evidence derived therefrom should be suppressed. Finally, Fortier claims that even if the warrant was valid and otherwise properly executed, the officers exceeded the scope of the warrant by seizing items not described in the warrant—specifically, the small black notebook and two pieces of notebook paper—requiring that these items be suppressed. For the following reasons, the Court denies Fortier's motion to suppress all evidence seized from his person on February 21, 1985.[7]

While it is true that the warrant only authorized the search of the first floor of 22 Mason Street, and not the apartment in the detached renovated garage, the Court finds that Detective Bouchard was justified in his belief that the former location was Fortier's residence.[8] The officers did, however, have a valid warrant to search the person of Fortier, and the Court finds that

---

**7.** Fortier's motion also seeks to suppress items seized from his apartment in the renovated garage on the same date, but in light of the Court's finding that nothing was so seized, this aspect of his motion will not be addressed.

**8.** Fortier apparently considered the first floor apartment at 22 Mason Street, where his mother lived, to be his official address, since this was the address he listed with the Registry of Motor Vehicles and on his booking sheet with the Nashua police. In addition, his common-law wife's mother, Mrs. Winslow, who owns 22 Mason Street and lives on the second floor, testified that Fortier's "main address" is the first floor apartment and that Fortier occasionally stays there when he has an argument with Ms. Foote. Mrs. Winslow also testified that on some occasion prior to these events she was questioned by the police about Fortier and she did not inform them that Fortier actually lived in the detached apartment.

there were sufficient exigent circumstances to permit them to make a warrantless entry into Fortier's true residence to execute this warrant.

■ The United States Supreme Court has consistently recognized that "a warrantless entry by criminal law enforcement officials may be legal where there is a compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 506, 98 S.Ct. 1942, 1948, 56 L.Ed.2d 486 (1978); *Roaden v. Kentucky*, 413 U.S. 496, 505, 93 S.Ct. 2796, 2801, 37 L.Ed.2d 757 (1973); *Warden v. Hayden, supra,* 387 U.S. at 298, 87 S.Ct. at 1645; *Ker v. California*, 374 U.S. 23, 40–41, 83 S.Ct. 1623, 1633–34, 10 L.Ed.2d 726 (1963). In this Circuit, the test for determining whether exigent circumstances exist so as to justify a warrantless entry is "whether there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant." *United States v. Adams*, 621 F.2d 41, 44 (1st Cir. 1980). Many courts have recognized that one such compelling necessity is when there is a reasonable belief that evidence is about to be destroyed or removed. *United States v. Palumbo, supra,* 742 F.2d at 658; *United States v. Turner*, 650 F.2d 526, 528 (4th Cir.1981); *United States v. Edwards, supra,* 602 F.2d at 468–69; *United States v. Kulcsar*, 586 F.2d 1283, 1287 (8th Cir. 1978); *United States v. Delguyd*, 542 F.2d 346, 350–51 (6th Cir.1976).

■ The Court concludes that the officers executing this warrant were justified in believing that evidence would be destroyed or removed if they did not make a warrantless entry into Fortier's apartment. At the moment when Detective Ritz and Captain Watson approached the garage door, they were already concerned that Fortier had been alerted to their presence. A dozen officers had arrived in several vehicles, and there was a certain amount of commotion during the stop of the car leaving the driveway and the discussion with Fortier's mother. In rapid succession, Detective Ritz heard Detective Brackett yell that Fortier was in the bathroom, saw within the apartment a closed door to a lit room, and heard from this room the sound of a toilet repeatedly flushing. One need not be an experienced detective to conclude that evidence was probably in the process of being destroyed. Indeed, Fortier admitted in his testimony at the suppression hearing that he had been alerted to the arrival of the police and had then attempted to break and flush down the toilet a glass marijuana pipe. Once the police were inside the apartment, they only seized items from Fortier's person, which was authorized by the search warrant they had, and which was unaffected by the mistake regarding the location of Fortier's residence. The exigent circumstances described above justified the warrantless entry into Fortier's apartment, and thus there is no basis to suppress the evidence seized from Fortier's person during the ensuing search pursuant to a valid warrant.

■ Fortier's challenges to the form of the search warrant and manner in which it was executed are similarly without merit. His claim that the warrant had to specify the time period allowed for the search (not to exceed 10 days) as required by Rule 41(c)(1), Fed.R.Crim.P., is misplaced in that the warrant was issued by New Hampshire District Court Judge Pantelas, upon the application and affidavit of Detective Bouchard of the Nashua Police Department, and Rule 41, by its terms, applies to warrants issued by "a federal magistrate or a judge of a state court of record ... upon request of a federal law enforcement officer or an attorney for the government." Similarly, Fortier's claim that the officers executing this warrant failed to comply with the notice provisions of 18 U.S.C. § 3109,[9] rendering the entire search illegal,

9. 18 U.S.C. § 3109 provides that:

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

must fail. As a threshold matter, it is not clear that § 3109 even applies to this search in that it was conducted pursuant to a state search warrant by state officers, with the sole exception of DEA Agent Graffam. *See Sabbath v. United States,* 391 U.S. 585, 588, 88 S.Ct. 1755, 1757, 20 L.Ed.2d 828 (1968). However, even assuming arguendo that § 3109 applies, it was not violated in this search since the Court finds that the officers knocked on the door to Fortier's apartment and the door was simultaneously opened by Ms. Foote before the officers could announce their purpose. Entry through an open door, without force, does not constitute a "breaking" in violation of § 3109. *Reyes v. United States,* 417 F.2d 916 (9th Cir.1969); *United States v. Marson,* 408 F.2d 644, 646–47 (4th Cir. 1968).

 Fortier's final challenge to the seizure of evidence from his person on February 21, 1985, is that the police seized items not authorized by the warrant when they took the notebook and pieces of paper from Fortier's back pocket and jacket, respectively. It is true that this warrant only authorized the search for and seizure of controlled drugs and serialized United States currency, and as a general rule, officers executing a search warrant may only seize those items specifically listed in the warrant. *Marron v. United States, supra,* 275 U.S. at 196, 48 S.Ct. at 76; *United States v. Gray,* 484 F.2d 352, 354–55 (6th Cir.1973). However, it is also clearly established that under the "plain view" doctrine, seizable items, including evidence of a crime, that inadvertently come into the view of a lawfully searching officer may be seized and used as evidence. *Coolidge v. New Hampshire, supra,* 403 U.S. at 465, 91 S.Ct. at 2037. For this doctrine to apply and allow the seizure of evidence not listed in the warrant, the officer must (1) have a right to be where he is, prying into hidden places likely to contain the property he seeks, and (2) inadvertently come upon (3) immediately recognize (4) incriminating evidence. *Id.,* 403 U.S. at 446, 91 S.Ct. at

2027. These criteria have been met as to the notebook seized from Fortier's pocket; thus, although it was not listed in the warrant, it need not be suppressed. Since he was authorized to search Fortier's person for controlled drugs and United States currency, Detective Bouchard was clearly justified in searching all of Fortier's pockets. Both money and drugs are relatively small items, and Detective Bouchard could not have competently conducted this search without examining the contents of Fortier's pockets. Thus, when he came upon the notebook in Fortier's back pocket, recognized by Sergeant Brackett as containing names of people known to be involved in illicit drug activity, he was empowered to seize it under the plain view doctrine.

 Finally, the two pieces of notebook paper removed from Fortier's jacket pocket were validly seized as incident to his arrest. *United States v. Robinson, supra,* 414 U.S. at 235, 94 S.Ct. at 476. Whether these items were seized after the arrest, but while still at 22 Mason Street, or upon Fortier's arrival at the Nashua Police Station [10] is immaterial. *United States v. Edwards,* 415 U.S. 800, 803, 94 S.Ct. 1234, 1237, 39 L.Ed.2d 771 (1974).

The Court, in light of the above discussion, rules that defendant Fortier's motion to suppress the evidence seized from his person on February 21, 1985, in Nashua, New Hampshire, must be and herewith is denied.

### *Conclusion*

The Court finds and rules that defendants' motions, both individually or collectively, to suppress evidence seized and statements made under the circumstances described in this Order, must be and accordingly herewith are denied.

SO ORDERED.

10. There was conflicting evidence on this point.